EDWARD ANTALICK

*vs.*

EDWARD P. TICKEY

Superior Court          Fairfield County          File No. 57891

MEMORANDUM FILED APRIL 13, 1940.

*Greenstein & Simons,* of Bridgeport, for the Plaintiff.

*Pullman & Comley,* of Bridgeport, for the Defendant.

FOSTER, J.   The plaintiff, on April 28, 1939, was 24 years of age and weighed about 150 pounds. For 14 years he had been learning to play and had played a trumpet in an orchestra as a profession. For some months prior to April 28, 1939, he had been away from home playing the trumpet in an orchestra on a ship cruising southern waters. On that date, having recently reached home in Bridgeport, he met on a street corner near his home, at about 7 p.m., a friend of long standing named John Dudas.   They went to a tavern, owned and operated by Frank J. Tickey, to have a friendly drink.   Each ordered a glass of beer and they stood at the bar about twenty minutes renewing their acquaintance and each consumed his one glass of beer.   Neither the plaintiff nor Dudas was at all under the influence of liquor.   While standing at the bar they sang.   They were warned by the proprietor not to sing.   From time to time they continued to sing.   The

proprietor sent his "handy man," Eugene Jacques, to get a policeman.

The defendant, Edward P. Tickey, is a man of great strength and agility and weighs 210 pounds. He worked in the tavern as a bartender for his brother, Frank J. Tickey, but his work for the day had terminated at 5:30 p.m. and he had left the tavern. At the hour in question he was acting as a steward in a nearby club. Eugene Jacques, who had been sent for a policeman, couldn't find one and went to the club and asked the defendant where a policeman could be found. Quoting the testimony of the defendant, "Gene didn't call me, he come over and said, 'I was sent for an officer.' I said 'Did you find one?' He said 'No.' I said, 'Forget about it. Let's go down and see what the trouble is'." The defendant, accompanied by Jacques, went to the tavern, entered and struck the plaintiff in the mouth with his closed right fist, cutting the plaintiff's lips and gums and loosening two front teeth of the upper jaw, the upper left central and lateral incisors. The defendant testifies to being attacked by the plaintiff and Dudas and striking in self-defense. I do not credit this statement. As the defendant rushed into the tavern and toward the plaintiff and Dudas, I have no doubt that they grabbed the defendant; I have no doubt that they used toward him profane and possibly obscene epithets. The proprietor of the tavern weighs 220 pounds. He found no occasion to use force toward the plaintiff. He sent for a policeman. The defendant had no excuse at all for coming to the tavern. Without excuse he assumed to take into his own hands the ejectment of the plaintiff and Dudas from the tavern. The character of the blow struck by the defendant is well described in his own testimony. "I had a perfect shot. I hit him with my right hand with the closed hand, and I hit him in the mouth and he started to bleed."

The liability of the defendant is clear. The measure of the damage is not so easy to determine.

The plaintiff offers testimony of a reputable dentist. The defendant does not offer any evidence as to the injuries received by the plaintiff. This dentist testifies as follows:

"Q—And when you examined him on the 1st or 2nd of May what did you observe was the matter with him, Doctor?

A—Well, his upper lip was badly lacerated.

Q—Just go easy. Upper lip badly lacerated? A—And the gum tissue above the anterior teeth was pretty badly swollen and contusions, and the teeth were very loose.

Q—What teeth? A—The upper left central and lateral incisors.

The court: How many teeth?

The witness: Two.

Q—I see. And did you treat the teeth? A—Yes, for a period of months for the purpose of trying to keep them there so that he could play.

Q—You say you treated the teeth for months to keep them there, and what was the matter with the teeth? A—Well, just that they had suffered a terrific impact, and naturally their hold on the tissues had been damaged, and probably if not killed immediately might die over a period of time.

Q—What might die? A—The nerves in the teeth.

Q—And was the treatment that you were giving him to prevent the nerves from dying? A—No, the treatment that I administered was, at first I washed out his mouth, cleaned out the wound on the upper lip, and treated that soft tissue of his gum to get that healed up.

Q—Yes? A—And then we could try to give him probably lamp therapy, ultra-violet rays, and see if we could get some healing in the tissue below, and, of course, the only other thing we can do is to try to get scar tissue in the mouth so that the tissues may repair themselves and get those teeth back in some solid condition again. As a matter of fact, we construed splints, wire splints.

Q—Did you put wire splints in his mouth? A—I did.

Q—And what is the effect of your treatment having on these teeth? A—Well, the effect of the wire splints is to keep the teeth in one position so that while he is going through his normal duties of the day, and biting, he won't keep constantly pushing those teeth, moving them; much the same as a fractured bone, you set the bone.

The court: In other words, the wire splints are to immobilize the teeth?

The witness: That's right.

Q—Are the teeth becoming immobilized? A—They have to some extent, but I don't think they will ever be what they were. As a matter of fact, I would say that ultimately I think he will lose them.

Q—Are you still treating him? A—Well, the only reason he has been coming up lately is for a general checkup, and we usually, over a period of time, take periodic X-rays to note the repair of tissue.

Q—Yes? A—And we also want to find out whether any abscess conditions might arise as a result of the accident, or any other thing that might cause loosening of teeth.

Q—And it is your opinion that ultimately he will lose these teeth? A—I would. say in the practice of his profession I think he will. Those anterior teeth carry such a load that I don't think that he will have them very, very long.

Q—Have you made up his bill up to the present time, Doctor? A—Well, up to the present time I can say his bill would stand about $50, but I was in the process of taking an impression to see if I could construct a denture that would be placed in the back of his upper anterior teeth so that when he put the pressure of his horn against the anteriors it would hold them. Whether or not that will do any good, of course, we can't tell. It was merely a chance.

Q—What would the approximate cost of that be? A—Well, altogether it would probably run him, the whole bill would run about $75, if that was constructed.

The court: That includes the $50 you spoke of?

The witness: It does.

Q—And you have no idea how long he will have to continue under your care? A—Well, I can't say. After that appliance is put in his mouth it will travel along for a period of time, but it is hard to say whether or not it will stay there ultimately. As a matter of fact, the last I noted the gum tissue had receded away from the neck of the teeth considerably, exposing part of the root of the tooth, which in itself is not a normal condition.

Q—As I understand it, Doctor, you are now in the process of constructing this denture, right? A—That's right.

Q—So that until you have tried that you can't really give

us an idea as to whether or not he will have to lose his teeth, isn't that a fact? A—No. The application of that appliance will let me know whether or not it will allow him to play the horn any better than he does now, or any longer than he can now. It won't tell us whether or not the teeth are going to stay in position, or whether or not he will lose them. This is merely to facilitate his playing.

Q—And you first treated him in May, 1939? A—That's right.

Q—And he still has the two teeth that we speak of in his head? A—He has."

The physical injuries might be compensated by a few hundred dollars.

But here is a man 24 years of age who by constant practice has made himself able to earn more than $40 a week with reasonably constant occupation. He has suffered a permanent injury. His expectation of life is 38.59 years.

Quoting from the testimony of the plaintiff:

"Q—And you were not able to play were you, on account of your injuries? A—I couldn't play.

Q—Then you say you were to go to work on the Richard Peck on the 1st of May? A—That's right.

Q—And that would be for the season lasting until when? A—The end of September.

Q—Can you give us an idea of the date in September? A—About the 31st or so.

Q—And how much were you to get a week? A—$48.50.

Q—And were you able to play on the Richard Peck as a result of the injuries received? A—No, I was not. I haven't been able to play for at least seven months I could not touch the horn.

Q—Now why weren't you able to play the trumpet, Mr. Antalick? A—Well, your teeth are the most essential thing in playing. If your teeth are loose, or you have no teeth, you can't play.

Q—And did the front teeth, these particular teeth, play any important part in your ability to play the trumpet? A—

Yes, that is the most important part. All the pressure is done on the top teeth.

Q—And how are the teeth today? Can you explain their condition? A—My teeth today, if I play for an hour or hour and a half they loosen right up on me.

Q—Have you been employed recently? A—I have for a little while.

Q—Where were you employed last? A—I was employed at the Lyric theatre.

Q—When did you work at the Lyric? A—Well, I just got through four weeks ago.

Q—And how long did you play there? A—About two and one-half months.

Q—Where else have you played besides in the Lyric, Mr. Antalick? A—Before that?

Q—Yes. A—I didn't play before that. That was my first job after the accident.

Q—Yes, but I mean previous to this where had you been employed? A—Previous to that I have been all over the country with different bands, and foreign countries and all.

Q—What bands have you played with? A—Played with Will Osborne, Ozzie Nelson, Paul Tremaine.

Q—Those are famous bands, and you say you have played all over the United States? A—Yes.

Q—And toured foreign countries? A—Yes.

Q—If you play the trumpet for an hour or hour and a half are you affected in any way? A—I am. My teeth get loose again.

Q—And when your teeth get loose are you prevented from playing? A—Yes, I have to take more rest, and I can't do the work I am supposed to do. If I am compelled to do a certain thing I can't do it.

Q—Are there different classes of trumpet players? A—No. There are different classes, but they all use the top teeth to play. Without them they couldn't.

Q—You say ever since this injury you are affected in your playing? A—That's right.

The court: What kind of a trumpet?

The witness: Bach.

Q—What kind is that? A—That is the make of the instru-ment, or the horn.

Q—How many years have you been playing the trumpet? A—About fourteen years.

Q—You said in response to a question by Mr. Payne you were working with Jack Keller in New Orleans just prior to your coming home on the 22nd, I believe you said, of April? A—Yes, sir.

Q—Where were you working in New Orleans? A—We were cruising, going to foreign ports.

Q—Where? What ports? A—Well, we went to Panama, Caracas, Vera Cruz, Virgin Islands, Curacao, Venezuela, Guayra, Havana, Kingston Jamaica.

Q—Where? A—Kingston Jamaica, Trinidad, Port of Spain, Port of France, Martinique, I think that is the trip we made on that cruise.

Q—How long were you playing on that tour? A—On that tour, we were on that tour for three months.

Q—How much did you make a week on that tour? A—On that tour we were making $27 a week, room, board and all. That was clear to us.

Q—And how much was considered for room and board? A—Considered for room and board? You can't say on that. I mean you get the best of everything.

Q—That isn't figured in. It is $27, room and board? A—You are just like a first class passenger.

Q—And you say the last two and one-half months you were playing at the Lyric and you have been earning $50 per week? A—I have.

Q—Well, if you can't tell very well. Now you say you can't go back to the Lyric now. Why? A—I couldn't on ac-count of these teeth. They are too bad.

Q—Too bad in what way? A—This leader held me on as long as he could there. He finally told me I couldn't go back with him.

Q—Why can't you go back?  A—On account of my teeth. They are too loose.  I can't work the way I should.  If I get a high note to come true I can't do it.

Q—Can you work anywhere else?  A—No, I couldn't take a steady job.  No.

Q—And that is due to the fact of the condition of your teeth?  A—Yes, sir.

Q—But you worked two and one-half months at the best trumpet job in Bridgeport for $50 a week?  A—Yes, sir.

The court: How many keys on a trumpet?

The witness: Three.

The court: You make the notes by lipping?

The witness: I use the bottom lip to make my notes, and your valves also.

The court: Where do your teeth come in?

The witness: You have to press the mouth piece to your teeth in order to produce a tone."

This man, Edward Antalick, as a player of the trumpet was able to earn a substantial income.  He has been deprived of his ability to play a trumpet.  What can this man, Edward Antalick, though able-bodied, earn at any other work or profession?  And at what work or profession?

The court might, in order to do full justice, suggest to the plaintiff that the complaint be amended by increasing the claim of damages.

The plaintiff claims damages of $5,000.

Judgment may be entered that the plaintiff recover of the defendant damages of $5,000.